IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 619-962-9581 | Case No. 1:24-mj-773<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Zachary P. Johnson, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 619-962-9581, with listed subscriber Carolina Ochoa (the "Target Cell Phone"), whose service provider is AT&T, a wireless telephone service provider headquartered at AT&T. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent with the U.S. Department of State, Diplomatic Security Service ("DSS"), and have been since March 2012. My duties include the investigation of a

variety of federal offenses, including aggravated identity theft and those involving counterfeit and fraudulently obtained passports and visas.

4. The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1028A(a)(1) (aggravated identity theft), and 1542 (false statement in application and use of passport) have been committed by Gilberto Jimenez Adame. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B, and to locate and arrest Gilberto Jimenez Adame.

7. Based on the facts set forth in this affidavit, there is probable cause to believe that Gilberto Jimenez Adame has violated Title 18, United States Code, Sections 1028A(a)(1) (aggravated identity theft), and 1542 (false statement in application and use of passport). Gilberto Jimenez Adame was charged with these crimes on July 12, 2023, and is the subject of an arrest warrant issued on July 13, 2023. There is also probable cause to believe that Gilberto Jimenez Adame is aware of these charges and has fled. There is also probable cause to believe that the location information described in Attachment B will assist law enforcement in arresting

Gilberto Jimenez Adame, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

8.  The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9.  The United States, including DSS, is conducting a criminal investigation of Gilberto Jimenez Adame regarding violations of Title 18, United States Code, Sections 1028A(a)(1) (aggravated identity theft), and 1542 (false statement in application and use of passport).

10. On or about December 8, 2021, an application for a U.S. passport, form DS-11, submitted by individual later identified as Gilberto Jimenez Adame on November 22, 2021, in the name of Jesse Noe Moreno, was referred to the fraud office of the Department of State's Houston Fraud Prevention Unit because two individuals were using the same identity. The identity of Jesse Noe Moreno was linked to two prior 2016 passport fraud investigations by DSS San Diego Resident Office ("SDRO"). On February 9, 2016, an individual in the name of Jesse Noe Moreno submitted an application for a U.S. passport in San Diego, California. The passport application was flagged because there were already two U.S. passports and one U.S. passport card issued to Gilberto Jimenez Adame in the identity of Jesse Noe Moreno subsequently on June 19, 2008, and March 30, 2010. A review of the passport application photograph from 2016 to the two passport application photographs of Gilberto Jimenez Adame from 2008 and 2010 revealed two different individuals. Based on SDRO's investigation, the true Jesse Noe Moreno

applied for a U.S. passport for the first time in 2016. A particular U.S. passport and a particular U.S. passport card issued to Gilberto Jimenez Adame in the name of Jesse Noe Moreno were revoked by the Department of State, Consular Affairs. Agents from SDRO were unable to locate the Gilberto Jimenez Adame during their investigation.

11. On or about January 19, 2022, the Houston Fraud Prevention Unit referred the case to DSS Minneapolis Resident Office ("MIRO") for investigation.

12. On or about January 27, 2022, criminal history checks on Jesse Noe Moreno revealed two different Federal Bureau of Investigation ("FBI") numbers. The criminal activities under both numbers took place in California in the name of Jesse Noe Moreno. Arrest photographs obtained from DSS SDRO revealed one of the FBI numbers belonged to Gilberto Jimenez Adame and the other belonged to the true Jesse Noe Moreno. California Department of Motor Vehicles ("DMV") records of Gilberto Jimenez Adame in the name of Jesse Noe Moreno revealed he was issued a particular California driver's license. California DMV records also included a right thumbprint of Gilberto Jimenez Adame.

13. On or about February 1, 2022, North Dakota DMV records of Gilberto Jimenez Adame in the name of Jesse Noe Moreno revealed Gilberto Jimenez Adame had surrendered a particular Colorado driver's license to obtain a North Dakota driver's license on October 5, 2015. On October 1, 2021, Gilberto Jimenez Adame obtained a duplicate North Dakota driver's license in the name of Jesse Noe Moreno. As proof of citizenship, Gilberto Jimenez Adame submitted the same California birth certificate that he used on his passport application in the name of Jesse Noe Moreno. For proof of social security number, Gilberto Jimenez Adame submitted a 2020 W-2 that showed he earned wages from Teraflex Group LLC located in Williston, North Dakota.

14. On or about February 3, 2022, Colorado DMV records revealed Gilberto Jimenez Adame used the aforementioned particular U.S. passport card in the name of Jesse Noe Moreno as proof of U.S. citizenship and identity to obtain a Colorado driver's license. Gilberto Jimenez Adame obtained a Colorado driver's license on April 1, 2015. Colorado DMV records also included a right index fingerprint of Gilberto Jimenez Adame.

15. On or about February 4, 2022, Gilberto Jimenez Adame's right index fingerprint from his Colorado's driver's license and his right thumbprint from his California driver's license were submitted to the FBI fingerprint database for possible identification. On or about February 4, 2022, the FBI responded that the two fingerprints were a match to the FBI number belonging to Gilberto Jimenez Adame.

16. On May 18, 2022, DSS MIRO agents went to 1818 30th St W in Williston, North Dakota to interview Gilberto Jimenez Adame regarding his 2021 passport application. A female, later identified as Carolina Ochoa Vargas, answered the door. Carolina Ochoa Vargas informed agents that Gilberto Jimenez Adame was at work. Agents left their contact information with Vargas for Gilberto Jimenez Adame to contact agents after he returned home from work.

17. Shortly after agents departed the residence, agents received a phone call from Gilberto Jimenez Adame's phone number 619-962-9586, the same number listed on Gilberto Jimenez Adame's 2021 passport application. Agents informed Gilberto Jimenez Adame they wanted to speak to him regarding his passport application. Gilberto Jimenez Adame claimed he was still at work but would be home soon to speak with agents.

18. Later that evening agents returned to Gilberto Jimenez Adame's residence after they did not hear back from him as promised. Agents once again spoke to Carolina Ochoa Vargas who informed agents Gilberto Jimenez Adame had just been assigned an overnight shift

at his work and would not be able to speak to agents. Agents then departed the residence but noticed three minor children later identified as G.J., A.S.J.O., and B.C.J.O.

19.    After agents departed the residence, Gilberto Jimenez Adame texted an agent and wrote, "I will be staying at the rig to cover an overnight shift I will not able too [*sic*] meet today. Can i give you a call Tomorrow evening to see where we can meet." The agent responded via text message to Gilberto Jimenez Adame asking if they could meet him at his work. Gilberto Jimenez Adame responded via text message, "Tomorrow night sr. Thanks."

20.    On May 19, 2022, Gilberto Jimenez Adame failed to contact DSS MIRO agents as promised. Agents returned to Gilberto Jimenez Adame's residence at or around 3:00 p.m., but no one answered the door.

21.    On May 24, 2022, records revealed Carolina Ochoa Vargas had crossed the U.S./Mexico border, six days after agents had been to Gilberto Jimenez Adame's residence. Records also revealed three minor children had crossed with Carolina Ochoa Vargas at various times across the U.S./Mexico border. Records revealed minor A.S.J.O. used a particular North Dakota identification card to cross the border and minor G.J. used a different North Dakota identification card to cross the border.

22.    On or about May 26, 2022, a DSS MIRO agent received North Dakota DMV records for G.J. and A.S.J.O. North Dakota DMV records for G.J. contained a California birth certificate that listed no name for the father but did list the father's date of birth and place of birth Mexico. North Dakota DMV records for A.S.J.O. contained a North Carolina birth certificate that listed the father as Gilberto Jimenez Adame, with the same date of birth as listed in G.J.'s California birth certificate and place of birth Mexico. Both birth certificates listed the mother as Carolina Ochoa Vargas.

23. On May 26, 2022, a DSS MIRO agent called Gilberto Jimenez Adame's phone number 619-962-9586 and noticed, based on the agent's training and experience, that the ringtone was an international ringtone instead of an U.S. ringtone. Gilberto Jimenez Adame answered the phone call and confirmed he did submit and sign a U.S. passport application on November 22, 2021. The agent informed Gilberto Jimenez Adame there were two individuals using the identity of Jesse Noe Moreno and he would need additional documentation to prove he was the true Moreno. Gilberto Jimenez Adame then told the agent he would contact his mother for additional documents and would call back in a couple of days. Gilberto Jimenez Adame never called the agent back.

24. On or about June 24, 2022, a DSS MIRO agent received a California birth certificate for B.C.J.O. that listed the father as Gilberto Jimenez Adame, with the same date of birth as listed in the birth certificates for G.J. and A.S.J.O and the place of birth Mexico. The birth certificate listed the mother as Carolina Ochoa Vargas.

25. On July 12, 2023, Gilberto Jimenez Adame was indicted by a federal grand jury in Fargo, North Dakota, for violations of 18 U.S.C. § 1542 (willfully and knowingly making false statements in an application for a passport) and 18 U.S.C. § 1028A(a)(1) (aggravated identity theft). *See* Case No. 1:23-cr-131 (SEALED). A warrant for his arrest was issued by the U.S. District Court for the District of North Dakota.

26. Between July 20, 2023, and July 27, 2023, DSS SDRO agents unsuccessfully attempted three times to speak with Carolina Ochoa Vargas. DSS SDRO agents spoke with individuals who identified themselves as family members of Carolina Ochoa Vargas and informed DSS agents they would pass their contact information to Carolina Ochoa Vargas.

27.     On August 7, 2023, a DSS SDRO agent received a call from 619-962-9581. The caller identified herself as Carolina Ochoa Vargas. The agent tried to set up a time to speak to Carolina Ochoa Vargas regarding Gilberto Jimenez Adame, but Carolina Ochoa Vargas demanded more information that the agent was unwilling to share over the phone. Before Carolina Ochoa Vargas ended the phone conversation, she informed the agent to call her back at 619-962-9581 when the agent was willing to reveal more information.

28.     On January 29, 2024, a DSS MIRO agent sent a request to DSS agents posted at U.S. Consulate Tijuana in Mexico, seeking assistance in locating Gilberto Jimenez Adame. DSS agents at U.S. Consulate Tijuana were unsuccessful with their search.

29.     On March 14, 2024, a DSS MIRO agent obtained an apparent address for Carolina Ochoa Vargas in Mexico from her Mexican voter card that was gleaned after she was stopped by U.S. Customs and Border Protection at the U.S./Mexican border in San Diego, California. Her address was listed as AV Estado 29 1247B, Col Jose Maria Morelos 22707, Playas De Rosarito, B.C.

30.     On June 24, 2024, a DSS MIRO agent sent a second request to DSS agents posted at U.S. Consulate Tijuana in assistance in locating Gilberto Jimenez Adame. In the request was listed the address from Carolina Ochoa Vargas's Mexican voter card.

31.     On June 28, 2024, a DSS agent from U.S. Consulate Tijuana informed the DSS MIRO agent he was unable to locate the address listed on Carolina Ochoa Vargas's Mexican voter card. A check at Rosarito City Hall revealed the address was not registered in city hall records.

32. On October 10, 2024, the U.S. District Court for the District of North Dakota approved a 2703(d) order for phone numbers 619-962-9581 and 619-962-9586. I executed the 2703(d) order to AT&T on the same day.

33. On October 20, 2024, AT&T provided me the 2703(d) order returns. The returns revealed phone number 619-962-9581 belonged to subscriber Carolina Ochoa and phone number 619-962-9586 belonging to a Caro Ochoa. Both phone numbers were linked to the same billing account number 436118884789. Phone number 619-962-9586 was deactivated on September 27, 2022, which was shortly after Gilberto Jimenez Adame had failed to contact DSS agents.

34. As of October 30, 2024, records revealed that since May 24, 2022, Carolina Ochoa Vargas had crossed the U.S./Mexican border 401 times. This suggests she is traveling back and forth on a routing basis, and it is reasonable to infer she may be having recurring contact with Gilberto Jimenez Adame in Mexico.

35. In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as Global Positioning System ("GPS") data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records, as well as Network Event Location Operating System ("NELOS") information and mobile locator information. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.. E-911 Phase II, NELOS, and mobile locator data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several

of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II NELOS, and mobile locator data.

36.     Based on my training and experience, I know that AT&T can collect E-911 Phase II, NELOS, and mobile locator data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on AT&T's network or with such other reference points as may be reasonably available.

37.     Based on my training and experience, I know that AT&T can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**AUTHORIZATION REQUEST**

38.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

39.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

40.     I further request that the Court direct AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Cell Phone on AT&T's network or with such other reference points as may be reasonably available, and at such

intervals and times directed by the government. The DSS shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

41. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

Respectfully submitted,

Zachary P. Johnson
Special Agent
Diplomatic Security Service

Sworn to before me by reliable electronic means on ___Nov. 27___, 2024.

Clare R. Hochhalter
United States Magistrate Judge